J-S41009-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: T.M.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.L., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 545 MDA 2020 |

Appeal from the Decree Entered February 24, 2020,
in the Court of Common Pleas of York County,
Orphans' Court at No(s):  2019-0193a.

| | | |
|---|---|---|
| IN RE: ADOPT. OF A.E.L.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.L., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 546 MDA 2020 |

Appeal from the Decree Entered February 24, 2020,
in the Court of Common Pleas of York County,
Orphans' Court at No(s):  2019-0194a.

| | | |
|---|---|---|
| IN THE INT. OF: A.E.L.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:T.L., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 547 MDA 2020 |

Appeal from the Decree Entered February 24, 2020,
in the Court of Common Pleas of York County,
Orphans' Court at No(s): 2019-0195a.

BEFORE:   KUNSELMAN, J., McLAUGHLIN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                     **FILED NOVEMBER 19, 2020**

In these consolidated matters, T.L. (Father) appeals from the decrees involuntarily terminating his rights to three children – 10-year-old daughter A.L. (born 2010); 6-year-old daughter A.L. (born 2013); and 5-year-old son T.L. (born 2014) – pursuant to the Adoption Act. **See** 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).[1]  After review, we affirm.

The relevant history is as follows: The family came to the attention of the York County Office of Children Youth and Families (Agency) in December 2017 following allegations that Father abused T.L. (2014) by rubbing the boy's face in a mess he made, hitting him, and throwing him into a bathtub.  The child sustained injuries, and the court eventually found T.L. was a victim of abuse under 23 Pa.C.S.A. § 6303.[2]  There was also domestic violence between

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court also terminated the rights of T.L. (Mother). Her consolidated appeal is separately listed before this panel. **See** 436, 437, 438, and 439 MDA 2020.  In addition to these three subject children, Mother's case concerned a fourth child, 11-year-old A.L. (born 2008).  The father of A.L. is R.V., whose rights were also terminated.  R.V. did not appeal.

[2] It was also alleged Father sexually abused A.L. (2013) and A.L. (2010), but evidently the court was satisfied that there was no reason to pursue these

Mother and Father. In January 2018, the Agency filed an application for emergency protective custody, and the court removed the children from Father's care. The court adjudicated the children dependent.

The Agency developed a family service plan to aid in the reunification of the family. One concern for the court was Father's substance abuse. From February 2018 until May 2018, Father was incarcerated for possession of drug paraphernalia. He was also convicted of driving under the influence (DUI) and proceeded with DUI court. But since then, Father has been largely compliant with his drug and alcohol screens and has attended AA meetings, although he was apparently recorded drinking on a cruise he took with Mother in October 2019. Generally speaking, however, Father displayed moderate progress with his family service plan. His housing and employment had also been stable.

Yet, the dependency case lingered, in large part due to Father's inability to deal with the children's advanced behavioral issues. All of the children were diagnosed with disorganized attachment disorder on account of their developmental trauma and neglect. Most visitations between Father and the children were supervised in varying degrees. By June 2019, Father progressed to the point that he was able to receive overnight visitations; however, the court reinstituted supervised visits in November 2019 following the cruise incident. Thereafter, because the children were placed out of their

_____

allegations. We only mention them insofar as they were the impetus for the children's removal.

parents' care for approximately two years, the Agency petitioned for termination.

The court held termination hearings over the course of three dates, February 19-21, 2020; Father did not appear for one of those dates, citing a work conflict. Following the hearings, the orphans' court issued findings from the bench and terminated Father's rights. ***See*** Trial Court Opinion (T.C.O. 1), 2/21/20 at 1-17. The orphans' court issued decrees on February 24, 2020. Father timely-filed this appeal. Both Father and the orphans' court have complied with Pa.R.A.P. 1925.

He presents the following issues for our review:

> 1. Whether the [orphan's] court erred in terminating the parental rights of Father pursuant to Sections 2511(a)(1), (2), (5) and (8) of the Adoption Act.
>
> 2. Whether the [orphans'] court erred in concluding that termination of parental rights would best serve the needs and welfare of the children pursuant to Section 2511(b) of the Adoption Act.

Father's Brief at 5.

We review these claims mindful of our well-settled standard or review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have

- 4 -

previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotations marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation and quotation marks omitted).

In this case, the court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). [3] We need only agree with the court as to any one subsection of 2511(a), as well as Section (b), in order to affirm. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We begin with the first prong of the termination analysis under Section 2511(a). Specifically, we analyze the court's decision under Section 2511(a)(2).

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> [...]
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Under this subsection, the court made the following findings:

> Turning next to [Father], the same Sections [2511(a)(2)] apply to his circumstances. The [c]ourt appreciates his acknowledgement that the children are currently at a good place. The [c]ourt also wonders whether because of that belief he has consciously or subconsciously stepped back from services for the past few months. Nonetheless, he has stepped back. He has not been consistent in attending

---

[3] We note that neither the petitions for termination, nor the resulting decrees identified the specific, enumerated sections under Section 2511(a) upon which termination was granted. Instead, the Agency listed the text of the subsections that correspond with 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). Likewise, the resulting decrees simply granted the petitions.

counseling appointments or visits and that has had an impact on the children's relationships as they get excited to see him or to have him participate and then he is not there.

While the [c]ourt appreciates that he has a successful business and that he had a permit issue that he needed to deal with yesterday, he did not come for a day of his termination proceedings and that's concerning as it relates to priorities in these circumstances. Again, the issues relate to protective capacity and implementation of the education that he has had. The [c]ourt could focus on individual factors, but the [c]ourt agrees with the other team members that it is a composition of factors that creates the issues related to protective capacity. Any of them alone would not be enough, but in combination they create serious questions.

There were questions relating to the children riding bikes without helmets, watching inappropriate movies, there were issues related to his continued drinking after completion of a DUI Court and three DUIs; but concerning for the [c]ourt too is Father's own testimony looking at some of his phrases. The [c]ourt wrote down the following, essentially Father's working on a home with a creek across the road where the children can go and do their own thing. They can jump on a trampoline. They can play with rabbits. He got a go-cart. There were issues related to one child in the creek and another child with a go-cart. Father also indicated that he wanted to share all of the best moments with the kids and he didn't want to be that guy, essentially the father, the disciplinarian.

Additionally, related to implementation, Father completed the father's program through SpiriTrust, but recently the [c]ourt heard testimony that he lashed out through e-mails, text or other communication to both the EquiTeam professionals and to Ms. Arp such that he has essentially burned bridges with Ms. Arp's ability to engage in creating a stress-free environment for continued visits.

Father indicated that he understands trauma, but in his testimony and when describing the children's trauma, he focused on their behaviors and not his own. When asked about [A.L. (born 2010)]'s trauma issues he said, it related to isolation and entertaining herself; instead of his neglect,

his physical abuse, his mental abuse, her witnessing domestic violence in the home and her parentification related to parenting other siblings. When asked about [A.L. (born 2013)]'s trauma issues he indicated that she is an attention seeker. He did acknowledge, I was working long hours, which was more of a rationalization than an acknowledgement of the trauma he had caused, let alone where he would need to begin to address it. He came clos[est] when he was talking about [T.L. (born 2014)]. He said, it's not like abandonment neglect, it's just neglect. Notably, [T.L. (2014)] is the one with the indicated finding of physical abuse as it relates to Father.

The [c]ourt specifically asked both Catholic Charities team, Ms. Kearse, and the professionals, including Ms. Williams, how long it would take for the parents to engage in the therapy necessary to appropriately address the emotional needs of the children. Both service providers indicated it would take a long time. Therefore, Father would not, with any reasonable time, be in a present position to take custody, nor is he likely to be in a position to address the emotional needs of the children at any point in the near future. For all the reasons stated above […] it is also in the children's best interest to terminate Father's parental rights.

T.C.O. 1 at 12-16.

Regarding Section 2511(a)(2), we have explained:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.

- 8 -

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citations, internal quotation marks, and indentation omitted).

Turning to Father's argument, we observe that Father's Brief is not divided to correspond with the specific subsections of 2511(a). *See generally* Father's Brief at 10-31. Instead, he addresses Section 2511 generally. Moreover, while his Brief includes citations to the record, it does not include citations to relevant legal authority, nor does it present a coherent argument indicating where or how the court made a legal error or abused its discretion. *See* Pa.R.A.P. 2119(a) ("The argument shall be…followed by such discussion and citation of authorities as are deemed pertinent."); *see also Commonwealth v. Hansley*, 24 A.3d 410, 415 (Pa. Super. 2011) ("The court's review and legal analysis can be fatally impaired when the court has to guess at the issues raised.")

Be that as it may, given the court's findings and Father's arguments, we can still discern a common theme. Father evidently concedes there had been abuse, neglect, and an inability to parent, which has caused the children to be without his parental care. The crux of his argument is that he did all that the family service plan asked of him. Indeed, the court acknowledged Father's compliance and progress over the course of the dependency proceedings, but found termination was warranted based on Father's inability to parent. Therefore, we decline to find waiver, but we construe Father's challenge under Section 2511(a) as confined to the third step of the Section 2511(a)(2) analysis.

As the court noted, Father regressed in the months leading up to the termination hearing. Father's Brief cites the previous, positive testimony of Carla Arp, an employee with the service provider Pressley Ridge. *See* Father's Brief at 20. However, her testimony at the termination hearing told another story: "There has been really a complete disintegration of the relationship that I have with [Father] over the last serval months. His communication is virtually nonexistent, several visits have been canceled, he is very hostile." *See* N.T., at 70. Ms. Arp testified that Father had displayed appropriate parenting during supervised visits, but her concerns remained: "It's not that he doesn't have the ability to appropriately parent, he knows the skills. He stopped employing them at some point, but that's not my concern. My concern is more about his ability to protect the children." *Id.* at 72.

Specifically, Father demonstrated an inability to tend to the children's safety and emotional needs. As it pertains to the children's safety needs, the concern is that Father displayed questionable judgment at best, or an inability to comprehend safety issues at worst. Ms. Arp testified Father showed the children rated-R movies, allowed A.L. (2010) to cook, riding bikes without helmets, and driving the children on a tractor on a main road. *Id.* at 79, 104. None of these actions were particularly worrisome in and of themselves.

More troubling was Father's inability to comprehend and tend to the children's emotional needs, which are significant. At one point, Ms. Arp considered separating the older children from the younger children, because Father gave into A.L. (2013)'s attention seeking behavior while ignoring the

- 10 -

other children, which, in turn, caused conflict among the siblings. ***See id.*** at 76-77. Over time, Father showed some progress. Ms. Arp testified: "I do think there came a time where he started to acknowledge, wow, I may have caused trauma to my children." ***Id.*** at 113. But in time, Father regressed and has "fallen back on blaming everyone else involved in this process for the trauma his children are enduring." ***Id.***

Ms. Arp's testimony comports with the expert opinions proffered by Ellie Williams, the executive director and mental health therapist at EquiTeam, a service provider. Indeed, the children have serious behavioral needs as a result of their trauma. Ms. Williams testified that the children were diagnosed with disorganized attachment disorder. "[Disorganized attachment disorder] doesn't meet the qualifications for full blown reactive attachment disorder [RAD], that is a very severe diagnosis, and I hesitate to give that. Disorganized attachment is just they haven't reached the level of RAD. There hasn't been sort of killing animals or severe instances like that, but they are unable or have challenges attaching to caregivers and parental figures." ***See*** N.T. at 171.

The reason for this diagnosis is that all of the children have experienced significant "developmental trauma." Ms. Williams explained basis of the trauma as follows: "[W]hen there hasn't been the nurturing and the love and the care in an early childhood infancy, toddler, they believe, they start to believe when there has been neglect, 'I'm the bad person.' They have so much shame. […] Their acting out to an extreme level, the shame, this is who

- 11 -

we are, we are this bad and this is why we do this." *Id.* at 167. Consequently, the children displayed extreme behaviors, acted out, and refused to listen to directions. *Id.* at 157.

In order to address this misbehavior, Ms. Williams testified that she employed "didactic developmental psychotherapy techniques." *Id.* at 161. For instance, when the children are engaging in an activity in a dangerous manner, Ms. Williams will offer to teach the children to do the activity safely. If she told them "don't do that," Ms. Williams explained that the children will be triggered and act out. By engaging them in this manner, the children lose interest in the "fun" of acting out. *See id.* at 159-162.

Ms. Williams' testimony made clear that reunification can only be achieved once the relationship between the parents and the children is repaired, but that repairing the relationship necessarily means addressing the trauma. Ms. Williams testified that this would take "years and years and years." *See* N.T. at 183. Importantly, the parents would need to be "healthy and regulated" before they could even begin that work. *Id.* But Father has displayed either a refusal or an inability to address these concerns.

Ms. Williams testified that, while Father was engaged in the therapy sessions, Father resorted to minimizing his past mistakes and made hollow statements that he would do better. *Id.* at 182. Shortly before the termination hearing, Father emailed Ms. Williams to vent his frustrations about the case. *Id.* at 188. Ms. Williams characterized the email as displacing blame and minimizing the children's issues. *Id.* at 188-189. For instance, Father said

80 percent of children have tantrums; Ms. Williams testified that all children have tantrums, but that she had "never experienced such extreme behaviors within a therapy session [with the children] prior to this [case], ever." *Id.* at 189.

In light of the above, we conclude the orphans' court did not abuse its discretion in determining Father could not or would not remedy his inability or refusal to parent, thereby satisfying the third element of the Section 2511(a)(2) analysis. We agree with the court's broader view that Father's cooperation with various family service plan programs is for naught if he cannot or will not address the children's heightened behavioral needs, which necessarily includes addressing their underlying trauma.

Having concluded the orphans' court did not abuse its discretion regarding the first prong of the termination analysis under Section 2511(a)(2), we turn to the second prong of the analysis under Section 2511(b). This section addresses the needs and welfare of the children under the standard of "the best interests of the child." *See In re C.M.K.*, 203 A.3d 258, 261 (Pa. Super. 2019) (citation omitted). Specifically, Section 2511(b) provides:

> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which

are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §2511(b).

Under this prong of the termination analysis, the orphans' court determined that the children's needs and welfare would be best served by terminating Father's rights. The court summarized those findings as follows:

> [Regarding A.L. (born 2010)], she, while not having been in this home long, has been there long enough that she feels safe, secure, bonded with her sister and ready to move forward in her current setting. Notably while […] Father [has had] an opportunity to participate in counseling, that has not allowed them any meaningful way to help [A.L. (2010)] address the trauma in any way that would allow her to feel safe and move forward in the care of either parent.
>
> As it relates to [A.L. (born 2013)], the only person currently capable of addressing her current behaviors appears to be the foster parents. The [c]ourt has some concerns and would certainly like to support the foster parents with additional evaluations, which are underway. It is clear, however, that neither parent can handle those behaviors. Therefore, it is in her best interests to terminate parental rights.
>
> As it relates to [T.L. (born 2014)], his strongest bond at this point is most likely with his siblings. He also needs permanency. He has been in a stable foster home and needs to know that he will be able to stay there.

T.C.O. 1, at 10-11.

The court added:

> [A.L. (born 2013)] currently is experiencing severe behavior problems that only the parents[4] are able to

---

[4] The context indicates that the court was referring to the foster parents.

address. [T.L. (born 2014)], while he would like to return to parents, clearly has some past trauma where his behavior is also dysregulated and unlikely to be controlled in a safe way by the parents. Notably in his case also the foster parents were the ones who were successfully able to de-escalate him.

In looking at all of the children's bonds with their parents, it is clear that they have affection, but it is not clear that any of the children see the parents in a parental role. They are the play parents. They have been resistant to doing homework, imposing discipline, and doing the tough things that parents need to do. In summary, the [c]ourt is terminating the parental rights of all parents as it relates to these [] children.

T.C.O. 1, at 16 (footnote added).

With no citation to the record, Father argues "it is easily discernible that a strong bond exists between Father and the children" and that termination is "in no way beneficial" for them. *See* Father's Brief at 31-32. We disagree.

For one, although the bond analysis is "a major aspect of the Section 2511(b) best interest analysis, it is nonetheless only one of many factors to be considered by the [orphans'] court when determining what is in the best interest of the child." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted). More to the point, the question is not whether a bond exists, but whether termination would destroy a necessary and beneficial bond. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

Here, while the children have love and affection for Father – and have some degree of a bond with him – it is clear any detriment in severing that bond will be outweighed by the benefit of achieving stability for the children. Ms. Arp testified that she would not categorize the bond between Father and

children as a "parental" bond, such that they identify Father as a provider. *See* N.T. at 117. "I think it is a bond of familiarity based on history. They care about their dad. They are excited to see their dad. I see that enthusiasm when they return to the foster parents. So I don't want to mislabel what it is, but they do care about their dad, and they are excited to see him and have fun with him. These kids have been in care so much of their lives that I'm not sure they recall a time or the bond, so to speak, is based on what our family used to look like." *Id.* Ms. Arp explained further that the bond is "more of a reciprocal need; Father provides the attention the children crave, and that attention feeds Father's need to be wanted." *Id.* at 120. Ms. Williams opined that termination would be in the children's best interests because "[t]he extent of their trauma [is] so severe and there needs to be stability for the children to be able to work through that." *Id.* at 170.

To the extent the children have progressed, this progress depends on their ability to receive permanency and stability, which the record indicates can only be achieved through termination. Therefore, we conclude the orphans' court did not abuse its discretion when it found termination best served the children's needs and welfare.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/2020